**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**   ) | |
| ) | |
| Plaintiff,   ) | |
| ) | No. 5:20-CR-060-GFVT-MAS-1 |
| v.   ) | |
| ) | |
| **JOHN WILLIAM LAWSON,**   ) | |
| ) | |
| Defendant.   ) | |

**REPORT AND RECOMMENDATION**

This case is before the Court on Defendant John Lawson's ("Lawson") Motion to Suppress. [DE 21]. Hon. Gregory Van Tatenhove referred this matter to the undersigned for a Report and Recommendation. The United States responded to the Motion [DE 26]; Stewart did not reply. The Court held an evidentiary hearing and heard from counsel and one witness. [DE 29, 30]. For the reasons discussed below, the Court recommends that the District Court deny suppression.

## I.  FACTUAL BACKGROUND

**A.   AVIS D**ATABASE

Detective Gerald Salyer ("Detective Salyer"), a roughly three-year veteran of the Richmond Police Department ("RPD"), testified at the suppression hearing. [DE 30, Witness and Exhibit List]. Detective Salyer has been employed with the RPD since his graduation from the police academy in 2017. [Hearing Recording, at 01:50–02:12]. As part of his routine police work patrolling various thoroughfares in Richmond, Detective Salyer will often input a vehicle's license plate information in multiple databases, including the Automated Vehicle Information System ("AVIS"), to check its registration and insurance statuses. [*Id.*, at 13:40–14:35]. Detective Salyer

accomplishes this task through a mobile data terminal ("MDT") located in his patrol car. [*Id.*, at 03:50–04:02].

More specifically as to AVIS, Detective Salyer believes the database is principally maintained by the Department of Transportation ("DOT"). [*Id.*, at 04:50–05:00]. It reflects vehicle information such as registration, insurance, and title status. [*Id.*, at 05:00–05:10]. For insurance reporting, the AVIS readback may be either "Yes" or "Verify Proof of Insurance." [*Id.*, at 05:56–06:11]. A subset of the "Verify Proof of Insurance" readbacks may include an additional remark that the registration has been canceled for failure to maintain insurance. [*Id.*, at 08:35–08:57].[1] Detective Salyer represented that he has conducted nearly 1,000 traffic stops during his RPD tenure; each stop, he testified, included an AVIS search of the vehicle's license plate information. [*Id.*, at 06:35–07:02]. Detective Salyer further recalls having conducted approximately 100 stops solely based on an AVIS readback of "Verify Proof of Insurance." [*Id.*, at 07:05–07:15]. Roughly 25% of those specific "Verify Proof of Insurance" stops resulted in the operator ultimately demonstrating valid insurance coverage. [*Id.*, at 09:10–09:40]. Detective Salyer testified that the AVIS database is "more often than not" reliable, and a "Verify Proof of Insurance" readback corresponds with the actual absence of insurance proof. [*Id.*].

When an officer conducts a stop based on a "Verify Proof of Insurance" readback, the vehicle operator is required to produce insurance verification.[2] [*Id.*, at 09:40–09:54]. Detective Salyer has encountered scenarios where the driver is able to produce an ostensibly valid insurance card. Given the apparent AVIS discrepancy, Detective Salyer then contacts the listed insurer for

---

[1] This notation may appear where the County Clerk has sent a letter to a registered vehicle owner warning that it does not have updated insurance coverage on file, yet the owner has not taken action to update the vehicle's insurance information. [*Id.*, at 07:45–08:45].
[2] The parties do not dispute that Kentucky law requires drivers to maintain valid insurance coverage. *See* KRS §§ 304.99–060.

2

additional information. [*Id.*, at 10:10–10:43]. Per Detective Salyer, "numerous" such inquiries have led to the insurer advising that the policyholder had previously canceled the coverage after paying the initial premium, despite the issued card reflecting a six-month coverage term. [*Id.*]. In such cases, the driver in fact lacked the required insurance coverage and the AVIS database was, in fact, correct. However, Detective Salyer testified that in roughly 65% to 75% of cases in which drivers were able to produce an ostensibly valid card, further inquiry established that they *did* have valid insurance coverage, but had switched insurers or experienced other coverage changes that simply were not yet updated in the AVIS database. [*Id.*, at 11:00–12:10]. Thus, the database was not unreliable, but simply had not received the most recent information. Detective Salyer also explained that inadvertent lapses in coverage resulting from a changed debit or credit card at times prompted an AVIS "Verify Proof of Insurance" readback. [*Id.*, at 13:10–13:36]. Detective Salyer further noted ("rare") situations involving a "Verify Proof of Insurance" readback with the additional "registration canceled" remark, where the driver had recently obtained valid insurance coverage but had not yet contacted the County Clerk to reinstate his or her registration. [*Id.*, at 26:30–27:35].

The precise AVIS updating mechanics and timeline are not, on this record, entirely clear. At a minimum, though, it is evident that AVIS database maintenance is a joint effort by the DOT and County Clerks throughout the Commonwealth. [*Id.*, at 05:00–05:30, 27:35–28:20]. The process involves cross-referencing vehicles listed as registered in Kentucky with vehicles designated as validly insured in Kentucky. [*Id.*]. The County Clerk (in each Kentucky county) then updates AVIS with the registration and insurance information, and contacts registered vehicle owners without valid insurance via letter to warn that their registration will be canceled if they do

3

not obtain valid insurance. [*Id.*].³ Detective Salyer represented that the County Clerk updated the AVIS database monthly on the fifteenth of each month. [*Id.*]. Overall, Detective Salyer described the AVIS database as "very reliable" and "more often times than not . . . accurate." [*Id.*, at 19:00–19:25].

**B.     TRAFFIC STOP OF DEFENDANT LAWSON**

At approximately 2:58 a.m. on February 12, 2020, Detective Salyer was on routine patrol when he observed a blue Chevy Suburban travelling near the Eastern Bypass at Merrick Drive in Richmond, Kentucky. [*Id.*, at 13:40–14:35]. Detective Salyer ran the vehicle's license plate information in multiple databases, including AVIS. [*Id.*]. Detective Salyer initially checked the vehicle's information in the AVIS database simply because it was nearly 3:00 a.m., and there was no other activity requiring his attention at the time. [*Id.*, at 19:55–20:10]. The response from the database was a "Verify Proof of Insurance" readback. [*Id.*, at 14:35–14:43].⁴

Detective Salyer followed the Suburban as it exited a gas station near Merrick Drive and activated his police cruiser's lights to stop the vehicle based on the AVIS readback. [*Id.*, at 19:55–20:51, 14:45–15:45]. Upon stopping the Suburban, Detective Salyer asked the driver (later identified as Lawson)⁵ to provide identification and proof of insurance. [*Id.*, at 15:25–16:45]. Lawson was unable to produce valid insurance for the Chevy Suburban. [*Id.*]. Detective Salyer

---

    ³ It is not clear how much time vehicle owners would have post-letter to obtain insurance before the County Clerk updates AVIS with the additional "registration canceled" remark. In any event, there is no evidence on this record that Lawson's vehicle's AVIS readback included that additional remark. [*See* DE 26-2, at Page ID # 114 (simply referencing a "'verify proof of insurance' status"; Hearing Recording, at 14:40–14:43 (same)].
    ⁴ Although AVIS and the other databases identified Brandy Mullins ("Mullins") as the registered vehicle owner, Detective Salyer was not familiar with Mullins, and he did not attempt to check Mullins's criminal history. [Id., at 14:45–15:45, 20:30–20:40].
    ⁵ Though Detective Salyer testified that he knew of drug complaints pertaining to an individual named "Lawson," he did not recognize Lawson upon stopping the vehicle or associate him with the historical drug trafficking information. [*Id.*, at 22:00–22:24].

4

ultimately advised that he could call Lawson's purported insurer to verify coverage and directed Lawson to continue searching for the card. [*Id.*]. At that time, Detective Salyer returned to his cruiser to prepare a citation. [*Id.*].

While Lawson remained in the vehicle still searching for his insurance card, a canine unit arrived. [*Id.*, at 17:45–18:39, 20:25–23:08]. Detective Salyer testified that he and the canine officer, Madison County Deputy Sheriff Jonathan Thompson ("Deputy Thompson"), frequently conducted patrol duties together when they worked together on third shift. [*Id.*]. Deputy Thompson, thus, was already en route to Detective Salyer's location with the canine and arrived on-scene before Detective Salyer requested any assistance relative to the stop. [*Id.*]. Lawson does not dispute this chronology. [*See* DE 21, at Page ID #64–65 (noting that Lawson searched for his insurance card "for approximately ten minutes," and the dog sniff occurred "[w]hile Lawson was still searching for the document").].[6]

After conducting an open-air sniff of the Suburban, the canine alerted (*i.e.*, gave a positive response, indicating the likely presence of illicit substances) at both the rear and the driver's side door of the vehicle. [*Id.*, at 24:40–25:25]. Lawson initially hesitated to step out of the vehicle but ultimately complied with Detective Salyer's orders to do so. [DE 26-2, at Page ID # 114]. Upon searching Lawson, officers located roughly $570 in cash, a hydrocodone pill, a plastic bag with apparent drug residue, and multiple rounds of ammunition. [*Id.*]. A subsequent vehicle search further revealed a loaded handgun accessible to the driver's side of the vehicle, $23,070 in cash, glass pipes containing potential drug residue, and a digital scale. [*Id.*]. After confirming that Lawson was a convicted felon and unable to lawfully possess a firearm, officers arrested Lawson

---

[6] Defense counsel further indicated at the evidentiary hearing that she had viewed body camera footage from the stop. That footage does not appear in the record, and neither side introduced it at the hearing.

and impounded the vehicle.  [*Id.*].  Detective Salyer and fellow officers used the evidence uncovered during the vehicle search to obtain a search warrant for Lawson's residence.  [*Id.*, at Page ID # 115].  There, officers located additional cash, a firearm, and other suspected proof of narcotics trafficking activity.  [*Id.*].

## II.   ANALYSIS

Lawson moves to suppress all proof stemming the initial AVIS-based traffic stop.  He argues that Detective Salyer did not have reasonable suspicion for the stop based simply on the AVIS database readback. He urges the Court to exclude all fruits of the stop, including evidence obtained in the vehicle search and all items found in the later search of Lawson's residence. Lawson does not challenge the duration or scope of the stop.  The parties agree that the dispositive issue is whether an AVIS database "Verify Proof of Insurance" response supplies the requisite reasonable suspicion in this scenario.  That, in turn, hinges on system reliability.  The Government argues that the AVIS database is reliable and provided Detective Salyer with reasonable suspicion that Lawson had committed an insurance violation on February 12, 2020.

### A.   BASIS FOR THE STOP

"The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."  *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010) (quotation marks omitted); *see Terry v. Ohio*, 392 U.S. 1, 9 (1968).  "[A]n officer may conduct an investigatory stop only if he 'has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.'"  *United States v. Johnson*, 620 F.3d 685, 692 (6th Cir. 2010) (quoting *United States v. Place*, 462 U.S. 696, 702 (1983)).  Reasonable suspicion "requires that 'the detaining officers have a particularized and objective basis for suspecting the particular person stopped of criminal activity[.]'"  *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417–18

(1981)).  "This standard is less demanding than the probable-cause standard." *United States v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016).  The reasonable suspicion calculus demands a "totality of the circumstances" approach, "and a reviewing court view[s] the evidence offered in support of reasonable suspicion using a common sense approach, as understood by those in the field of law enforcement.'" *Id.* (quoting *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004)).

There are very few decisions applying this rubric to an AVIS database or its equivalent.  Here, within the Sixth Circuit, no court has directly addressed the topic.  Several other federal and some Kentucky courts, however, have confronted the issue.  The analyses typically focus on the officer's familiarity with the particular database system and the system's reliability.

For example, the Fifth Circuit recently held that "[a] state computer database indication of insurance status may establish reasonable suspicion when the officer is familiar with the database and the system itself is reliable."  *United States v. Broca-Martinez*, 855 F.3d 675, 680 (5th Cir. 2017).  The court found that even "a seemingly inconclusive report such as 'unconfirmed' will be a specific and articulable fact that supports a traffic stop" where the system is reliable.  *Id.*  The *Broca-Martinez* court thoroughly surveyed apt circuit authority, observing that the suppression outcome generally is contingent on whether there is proof of database unreliability.  *Compare*, *e.g.*, *United States v. Cortez-Galaviz*, 495 F.3d 1203, 1206 (10th Cir. 2007) (concluding that an insurance "'not found' response" supplied "particularized and objective information" justifying "a brief traffic stop" where the record lacked proof demonstrating unreliability of the database) *with United States v. Esquivel-Rios*, 725 F.3d 1231, 1235 (10th Cir. 2013) (finding concrete evidence of system unreliability where the database regularly "yielded a 'no return' response" for certain temporary tags regardless of insured status and concluding that, for such tags, the database response alone was an insufficient stop basis because "a 'no return' doesn't suggest criminal

7

conduct but only some bureaucratic snafu"). *See also Esquivel-Rios*, 725 F.3d at 1235 ("This court and others have regularly upheld traffic stops based on information that the defendant's vehicle's registration failed to appear in a law enforcement database—at least when the record suggested no reason to worry about the database's reliability.") (collecting cases). The *Broca-Martinez* reasoning further relied on factually analogous cases from the Sixth, Seventh, and Eighth Circuits:

> Cases from the Seventh, Sixth, and Eighth Circuits confronting similar fact patterns are generally consistent with the reasoning in *Cortez-Galaviz* and *Esquivel-Rios*. *See Miranda-Sotolongo*, 827 F.3d at 671 (finding reasonable suspicion established when the database showed no vehicle registration record, "at least in the absence of evidence that [the officer] could not reasonably rely on the absence of a registration record to support an investigative stop"); *United States v. Sandridge*, 385 F.3d 1032, 1036 (6th Cir. 2004) (concluding there was reasonable suspicion for a stop when license plate check three weeks prior had indicated the driver was driving without a valid license); *United States v. Stephens*, 350 F.3d 778, 779 (8th Cir. 2003) (holding that when database check showed license plates were "not on file," there was reasonable suspicion to stop the vehicle).

855 F.3d at 679–80.

Federal district courts have taken a similar approach focusing on database reliability and officer familiarity. *See, e.g.*, *United States v. Vela*, No. 2:15-CR-429, 2016 WL 305219, at *2 (S.D. Tex. Jan. 25, 2016). The Southern District of Texas there found "that when the MDT check on Vela's car returned an 'unconfirmed' insurance status," the officer "had reasonable suspicion to justify the traffic stop." *Id.* The court emphasized that the officer "routinely [ran] insurance checks on his MDT" during his five-and-a-half years with the department and cited proof that, in the officer's experience, "when the MDT check returns an 'unconfirmed' insurance status, he is reasonably certain that the vehicle does not have insurance as required by law." *Id.* The insurance database response thus adequately supported the stop under the circumstances. *See also United States v. Gartrell*, No. 2:04-CR-97-DB, 2005 WL 2265362, at *11 (D. Utah Sept. 7, 2005) (discussing insurance database reliability and ultimately concluding that the officer's "reliance on the information obtained from the [d]atabase was reasonable[,]" thus independently supplying "a

8

valid basis to stop Defendant's vehicle"); *cf. United States v. Sanchez*, No. 08-40058-01-SAC, 2009 WL 3836398, at *8 (D. Kan. Nov. 16, 2009) ("[T]he record in this proceeding does not show that the state's system for maintaining and reporting temporary tag registrations was not timely maintained or was so frequently incorrect that a dispatch's report of tag not found would be inherently unreliable and an insufficient basis for finding reasonable suspicion.").

AVIS-specific Kentucky law also centers on system reliability. A 2014 court of appeals remanded for further record development where "there [was] a lack of substantial evidence supporting the trial court's only finding regarding the crucial question of AVIS's reliability." *Willoughby v. Commonwealth*, No. 2012-CA-000776-MR, 2014 WL 92253, at *5 (Ky. Ct. App. Jan. 10, 2014) (*Willoughby I*), *opinion not to be published*. After discussing the case law consensus that stop legitimacy turns on database reliability, the appellate court offered specific direction:

> [O]n remand, the trial court shall hear and consider further evidence concerning AVIS, including, but not limited to: what the various indications provided by AVIS mean, both in theory and in practice; whether the database's "match rate" can be definitively determined; and how (in)frequently an indication of "verify proof of insurance" indicates that a vehicle is uninsured.

*Id.* at *6. The court, though, "like the few courts who have taken up this issue, refuse[d] to announce a threshold value or percentage" establishing system accuracy for reasonable suspicion purposes. *Id.*

On post-remand appeal, the court ultimately found substantial evidence that the officer "was entitled to rely on AVIS, which is based upon objective data collected by the Transportation Department." *Willoughby v. Commonwealth*, No. 2015-CA-000466-MR, 2017 WL 1290645, at *5 (Ky. Ct. App. Apr. 7, 2017) (*Willoughby II*). The opinion noted "that although AVIS does not guarantee that the verify proof of insurance indicator is conclusive in every case, it certainly provides an objective, articulable basis for suspecting that the vehicle may be uninsured." *Id.* (quotation marks omitted). The court cited officer "testimony regarding his own experience—

9

that when the verify proof of insurance appeared on his computer, more times than not the vehicle turned out to be uninsured." *Id.* It thus affirmed the trial court's reasonable suspicion finding. *Id. See also Lynem v. Commonwealth*, No. 2017-CA-001632-MR, 2018 WL 6423518, at *4 (Ky. Ct. App. Dec. 7, 2018), *review denied* (Mar. 6, 2019), *opinion not to be published* (holding, without substantive analysis, that an AVIS "verify insurance" readback supplied reasonable suspicion for the stop).[7]

Turning back to current matter, the Court applies the prevailing framework: (1) whether the record adequately demonstrates an officer's familiarity with the relevant database and (2) whether the record adequately demonstrates the reliability of said database.[8]

First, the record establishes Detective Salyer's experience with and understanding of the AVIS database. Detective Salyer had been with the RPD for more than three years at the time of the February 12, 2020 stop. [Hearing Recording, at 01:50–02:12]. He testified to using the AVIS database in each of his roughly 1,000 traffic stops during that timeframe. [*Id.*, at 06:35–07:02].

---

[7] *Cf. Gonzalez-Gilando v. State*, 306 S.W.3d 893, 897 (Tex. App. 2010) (concluding that, absent "evidence developing the source of the information comprising the database, explaining what was meant when insurance information was unavailable, explaining why such information would be unavailable, illustrating the accuracy of the database, [and] establishing the timeliness of the information within the database," among other things, there was insufficient evidence justifying the stop); *but see Short v. State*, No. 09-10-00489-CR, 2011 WL 3505611, at *3 (Tex. App. Aug. 10, 2011) (finding the facts "distinguishable from those in *Gonzalez-Gilando*" where there was "more information about the accuracy of the insurance database" and the officer testified, that in his experience, the information in the insurance database was very accurate").

[8] Lawson does not challenge Detective Salyer's basis for entering the Suburban's license plate information in AVIS at the outset. In any event, the cases indicate that such an argument would not merit relief. *See United States v. Ellison*, 462 F.3d 557, 561 (6th Cir. 2006) (declining to extend Fourth Amendment protections to license plates because "[n]o argument can be made that a motorist seeks to keep the information on his license plate private"); *Traft v. Commonwealth*, 539 S.W.3d 647, 649 (Ky. 2018) (concluding that the driver "certainly had no reasonable expectation of privacy in his license plate—either subjectively or objectively"); *Lynem*, 2018 WL 6423518, at *4 ("In light of *Traft*, the police officers' ostensible or actual motives in checking Lynem's license plate number in the AVIS system are immaterial.").

10

He recalled conducting approximately 100 traffic stops solely based on an AVIS "Verify Proof of Insurance" readback. [*Id.*, at 07:05–07:15]. Detective Salyer was further able to explain the various AVIS response options and opine as to their situational accuracy, in context, from firsthand experience. [*Id.*, at 05:56–06:11, 09:10–09:40, 11:00–12:10, 13:10–13:36, 26:30–27:35]. And, though he did not explain the AVIS database maintenance process with absolute precision, Detective Salyer apparently had a sound understanding of the general mechanics. [*Id.*, at 04:50–05:30, 27:35–28:20 (explaining that the County Clerks and DOT update AVIS monthly by cross-referencing registered vehicles with validly insured vehicles)]. These facts demonstrate reasonable system familiarity. *See Vela*, 2016 WL 305219, at *1 (observing that the two involved officers, one employed with the department for five-and-a-half years and the other for two-and-a-half years, "testified that they regularly use[d]" the at-issue database); *Broca-Martinez*, 855 F.3d 675, 677 (5th Cir. 2017) (recognizing that the officer had "in the past performed multiple traffic stops for vehicles not having insurance") (quotation marks omitted); *id.* at 680 (noting that the officer's testimony "described how records in the database are kept").

Second, Detective Salyer's testimony sufficiently establishes the AVIS database's reliability. Detective Salyer estimated that only a quarter of "Verify Proof of Insurance" stops resulted in the driver having valid insurance, in his experience. [Hearing Record, at 09:10–09:40]. He characterized the database as "very reliable" and "more often times than not . . . accurate." [*Id.*, at 19:00–19:25]. When queried about specific scenarios, Detective Salyer identified only one—frequently occurring when drivers were in fact able to produce a seemingly valid insurance card (per Salyer, 65% to 75% of those cases)—that suggested AVIS inaccuracy. [*Id.*, at 11:00–12:10]. Those situations involved drivers swapping coverage mid-month before AVIS was updated to reflect the switch. The other circumstances discussed—policies lapsing for inadvertent payment

11

errors, drivers initiating coverage but immediately canceling after receiving their insurance cards, and individuals validly reinstating insurance policies but neglecting to update their vehicle registration after its cancelation for failure to maintain insurance—are all examples of situationally accurate AVIS readbacks.[9] On the whole, Detective Salyer's concrete examples support his view that the AVIS system is, much more often than not, reliable and accurate. *See Willoughby*, 2017 WL 1290645, at *5 (crediting the officer's "testimony regarding his own experience[,]" which showed "that when the verify proof of insurance appeared on his computer, more times than not the vehicle turned out to be uninsured") (quotation marks omitted).

AVIS update frequency also, under a totality of the circumstances approach, may impact readback reliability. Lawson does not challenge Detective Salyer's testimony that the insurance information is refreshed monthly (in Salyer's view, on the fifteenth of each month). Nor does Lawson meaningfully argue, or submit authority indicating, that monthly updating is so infrequent as to render the system unreliable as a general matter. Analogous cases involving license status information, in fact, suggest the opposite. *See, e.g.*, *Sandridge*, 385 F.3d at 1036 (finding three-week-old license invalidity information sufficient to justify a stop because "[d]riving without a valid license is a continuing offense—in contrast, say, to a speeding or parking violation" and there were no facts indicating that the officer "should have assumed that Sandridge's ongoing offense had ceased between March 5 and March 27, 2002"); *United States v. Pierre*, 484 F.3d 75, 84 (1st Cir. 2007) (finding that five-month-old license invalidity information supplied reasonable suspicion); *People v. Mazzie*, 926 N.W.2d 359, 367 (Mich. Ct. App. 2018) (collecting cases, some finding 30-day and 40-day gaps sufficient). Like driving without a license, failure to maintain

---

[9] Indeed, Detective Salyer testified that the latter scenario, involving a canceled registration issue, included the specific AVIS notation to that effect.

12

insurance is characteristically a continuing offense. No authority or case-specific facts indicate that the 27-day (at most) informational gap in this case rendered the AVIS response unreliable or the information stale.

Lastly, Lawson's actual insurance documentation similarly fails to cast material doubt on AVIS reliability. [DE 30, Exhibits 1–3]. At most, it confirms that Lawson's insurance payment was past-due as of February 4, 2020, and that Lawson's insurer (Nationwide) would deem the policy expired as of January 31, 2020, unless Lawson brought his account up to date by February 19, 2020. [Exhibit 1]. The parties (and Court) agree that Lawson's actual insurance status on February 12 is not dispositive. Still, one inference from the past-due letter is that Lawson's policy was technically unexpired on February 12 because of the payment grace period (and, thus, was also unexpired on January 15, 2020, the most recent AVIS reporting date). The February 12 "Verify Proof of Insurance" readback would have occurred despite Lawson having coverage in the system, suggesting a potential instance of system inaccuracy. However, the letter prompts more questions than answers. When was Lawson's payment originally due? And when did Nationwide consider it "past due"? Perhaps Lawson's payment was due but not received and Nationwide reported a corresponding lapse in coverage before January 15, 2020. The tendered screen capture of Lawson's policy details offers no additional clarification. [Exhibit 3]. The screen capture is not dated. Though it reflects (in one place) a "Policy Effective Date" of "01/31/2020" and a "Policy Expiration Date" of "07/31/2020[,]" there is no reflection of payment status. Moreover, in another place, the document indicates a policy "Cancel Date" of "01/31/2020[.]" And it further designates the policy "Status" as "CANC/NP RENL[.]" There is no information or testimony in the record explaining these dates, terms, and codes. On balance, the speculative and unclear nature of the documentation severely diminishes its probative value in the AVIS reliability calculus.

Against the weight of uncontroverted testimony demonstrating AVIS database reliability, the inconclusive insurance papers do not seriously impact the proof landscape or analytical outcome.

In sum, Detective Salyer fairly evinced an understanding that Kentucky law requires drivers to maintain valid insurance. It does. *See* KRS §§ 304.99–060. Moreover, Detective Salyer established, at the time of the stop in this case, considerable familiarity with the AVIS database and its functioning in specific contexts. Further, the record adequately demonstrates system reliability, as applied to the circumstances of this case. Accordingly, consistent with the relevant case law, the AVIS database's "Verify Proof of Insurance" readback on Lawson's vehicle formed the basis for Detective Salyer's reasonable suspicion that the operator was committing an insurance violation. The stop was thus justified.

**C.   SCOPE AND DURATION OF THE STOP**

Additionally, investigatory stops "must be limited in [both] scope and duration." *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010) (quotation marks omitted). *Terry* detention "must . . . last no longer than is necessary to effectuate the purpose of the stop[,]" and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* at 488–89 (citation omitted).

Because a canine sniff does not "constitute a search within the meaning of the Fourth Amendment[,]" the "use of a well-trained drug dog does not in itself implicate any legitimate privacy interests." *United States v. Perez*, 440 F.3d 363, 375 (6th Cir. 2006). The canine involvement simply may not unreasonably extend stop duration. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (internal quotation marks omitted). "[T]here is no rigid time limitation on the lawfulness of a *Terry* stop." *Id.* (quotation marks omitted). Rather, the Court must "examine

14

whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.*

As discussed, the unchallenged stop timeline shows canine unit arrival and open-air sniff initiation within minutes of Detective Salyer initially pulling over Lawson. It is undisputed that, when Deputy Thompson arrived with the canine, Lawson remained in his vehicle searching for insurance verification. [Hearing Record, at 17:45–18:39, 20:25–23:08; DE 21, at Page ID #64–65]. Detective Salyer testified that he was then retreating to his cruiser to initiate a citation, while Lawson continued to search for his insurance card. Lawson's production of insurance proof was unquestionably the goal of Detective Salyer's stop in this case. Critically, Lawson advances no meaningful argument that the dog sniff itself improperly extended stop duration or scope under the circumstances.[10] Per the unimpeached factual record, the investigatory stop indeed was reasonable in both scope and duration, plainly targeted at verifying Lawson's insurance coverage.

### III. CONCLUSION

Lawson advances no suppression theory germane to the vehicle or residential searches themselves. He simply casts their fruit as the product of an initially unlawful stop.[11] The initial AVIS-based stop was, for the many reasons discussed, lawfully based upon reasonable suspicion of criminal activity (a perceived insurance violation). And subsequent investigative efforts did not unreasonably extend or exceed the purpose of that stop. The facts and pertinent law do not support

---

[10] Lawson emphasized at the hearing, on cross, that the post-sniff vehicle search was a lengthy process. But it had, at that point, morphed from a *Terry* stop into a probable-cause-based search. Lawson does not argue otherwise.

[11] The positive canine response undoubtedly supplied probable cause for the vehicle search. *See, e.g.*, *United States v. Patton*, 517 F. App'x 400, 402 (6th Cir. 2013) (citing *United States v. Diaz*, 25 F.3d 392, 393–94 (6th Cir. 1994)) ("[A]n alert by a properly trained narcotics dog while sniffing a vehicle is sufficient to establish probable cause for a search of the vehicle."). The record contains little detail about the subsequent residential search warrant. It does, though, tie that search to the items seized from Lawson's vehicle and found on his person upon arrest. Lawson does not separately address or challenge the residential search.

15

exclusion of the challenged evidence in this case. The Court thus **RECOMMENDS** that the District Court **DENY** Lawson's suppression motion.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of the statute. As defined by § 636(b) (1), FED. R. CRIM. P. 59(b), and local rule, **within fourteen days** after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, *de novo*, by the District Court.

Entered this the 1st day of October, 2020.



Signed By:
Matthew A. Stinnett
United States Magistrate Judge